## THE STATE v. PETER CUCUEL.

1. From the earliest times, it was a part of the method of proceeding in the system of the English law, in all capital cases, to sequester the jury, to a certain extent, from the rest of the community. The same formula has ever been observed in this state, and is part of the legal system, which this court are bound to sustain and administer.

2. When criminal trials are extended through a number of days, it is no deflection of the original rule, to place the jury, in case of adjournment, in charge of a sworn officer of the court, with instructions not to permit any communication between the jury and other persons with regard to the case on trial. As a consequence, it is competent for the court to authorize the jury or any of them to visit their homes in the company of one of the sworn officers, or to walk out for exercise.

3. If the jury and the officers fail to comply with the instructions given them by the court, it does not follow that on this account, *ipso facto*, the verdict must be set aside. An application to set aside a verdict, is always addressed to the sound discretion of the court.

4. A verdict will not be set aside on account of the misconduct or irregularity of a jury even in a capital case, unless it be such as might affect their impartiality or disqualify them from the proper exercise of their functions.

5. If any ground whatever appears for a belief or even suspicion that such a condition of things existed, a new trial ought to be freely granted.

6. That the officers who were ordered by the court to take the jury to some convenient private place, kept them at a public inn, an officer being always with them, is no ground for setting aside the verdict.

7. That one of the jurors on a visit home with the officer went into the house for a short time, while the officer remained outside at the door, will not vitiate the verdict, it being made to appear by the state, that nothing occurred which could raise a suspicion of the juror receiving any bias *ab extra*.

8. It is neither censurable nor irregular, that a juror visited his home on three different occasions, in the presence of an officer; it being shown that the juror had no conversation with any one respecting the trial.

9. It does not vitiate the verdict, that members of the jury during the continuance of the trial, drank at various times ardent spirits, there not being the slightest evidence that any one was to the smallest extent intoxicated, or in any perceptible degree under the influence of intoxicating agents, and the negative testimony upon the point being of the most conclusive character.

10. The expression of a wish that the defendant might be hung, made in the presence of the jury by a man in liquor, and the reading in the newspapers by two others of the jurors, small portions of what appeared to be a report or abstract of the evidence, are not sufficient grounds to set aside a verdict.

The defendant was tried in the Court of Oyer and Terminer of the county of Morris, on an indictment for murder, and found guilty of murder in the first degree.

A rule to show cause why the verdict should not be set aside and a new trial granted, was applied for on the part of the prisoner and having been allowed, the hearing of the rule was referred to this court for its advisory opinion.

The general reason assigned for setting aside the verdict was the alleged misconduct of the jurors who tried the indictment, and of the officers or some of them having them in charge, and of other persons in presence of the jurors.

The case was argued before the CHIEF JUSTICE, and Justices VREDENBURGH and VAN DYKE.

For the prisoner, *J. Vanatta* and *J. G. Shipman.*

For the state, *H. C. Pitney* and *Attorney-General.*

THE CHIEF JUSTICE. The defendant has been convicted of the crime of murder in the first degree. The cause was tried before the Oyer and Terminer of the county of Morris, and in that court a rule was entered to show cause why the verdict should not be set aside and a new trial granted, by reason of the alleged misconduct " of the jurors who tried the said indictment, and of the officers or some of them having them in charge, and of certain persons who have

been in the presence of said jurors or some of them, while acting as jurors, and for no other reason."

The hearing of this rule has been referred to this court for its advisory opinion.

The topics discussed on the argument before this court will be considered under three heads; and the first to which attention will be directed is that which was most prominently presented, among the points taken by the counsel of the defendant, *viz.*, whether the courts of this state have the legal power to authorize any separation of the jury from each other, in a capital case, during the progress of the trial?

The trial in this case lasted for more than two weeks; and, as far as appears from the record now before this court, the only order on the subject made by the Court of Oyer and Terminer, was that embodied in the oath administered to the constables to whom the jury were given in charge, and which oath was in the following words, *viz.*, "You shall take this jury to some convenient place, and there keep them separate from all others during the adjournment of the court; you shall not permit any person to speak to them, nor shall you speak to them yourself upon the subject of this trial, and you shall return them into court when the court convenes again, with all convenient speed—so help you God."

As this order required the jury to be secluded in the usual manner, and as no other order made by the court in this regard appears upon the record, the question as to the authority of the court to modify such order and give additional privileges to the jury, during adjournment, would not have been regularly presented at this time for consideration, had not the counsel on both sides, on the argument before us, admitted that one or more of the jurors were permitted by the court to separate themselves from their fellows, and in company with one of the constables having them in charge, to visit their homes. This admission fairly places before this court the question above stated, and which, I have said, is first to be considered.

What, then, is the power of the court over the jury in capital cases, during its adjournments, whilst the trial is in progress?

It is clear that from the earliest times, as far back as tradition itself extends, it was a part of the method of proceeding, in the system of the English law, in all capital cases to sequester the jury, to a certain extent, from the rest of the community. No one acquainted with the subject will deny that this practice prevailed for many successive ages, and so far as is known to me, it has never been departed from by any English judicature. In this state, almost from the epoch of its settlement by our ancestors to the present moment, as we are informed by history, both printed and oral, the same formula has been observed. From these admitted incidents then, it would seem to be incontestably plain, that the formula itself is invested with every possible claim, to be considered a part of that legal system which this court is bound to sustain and administer. Is is not a matter of unsubstantial form, but one of the means provided by the law, to reach the result of a verdict founded exclusively on the evidence delivered in open court in the presence of the parties. It is, therefore, as much a right of the defendant as is any other act which the law requires, by immemorial usage, to be performed at the trial. It is altogether impossible to admit the right of the court, at its pleasure, to waive the performance of this act. If the seclusion of the jury can be dispensed with before the charge of the court, why not dispense with it after such charge? And if the power to alter in one respect the admitted mode of ancient procedure is conceded to the court, what power to alter the forms of the trial can be denied? Upon this point the case of *Stevens* v. *The People*, 19 *New York* 549, was cited and relied on; but I must protest, with emphasis, against the introduction into the jurisprudence of this state, of the doctrine upon which that case is placed. The theme is there treated, not as an inquiry as to the existence of the power, but as a question of mere expediency. In the opinion delivered in the case, it

State v. Cucuel.

seems to be considered as a matter of but small moment, that the form of placing the jury apart from the rest of the public in all capital cases, has been observed from the most remote era; but the argument proceeds upon the notion that the court can and should change the form, on the ground that the restraints upon the jury incident to such form, are not compatible with the multiform business, the comfort, and the intelligence of the present age. It is scarcely necessary to remark that this argumentative position, if tenable, will enable the courts, at their pleasure, to demolish any part and all parts of those forms of trial which are the safeguards of all private rights, and which have been established for centuries. It is, in effect, to assume that the entire trial by the country is in the hands of the court. Why put the intelligent witnesses of this age under the pledge of an oath? Why doom the man, whose affairs are pressing, to the tedium of a protracted cross-examination? Why require of our intelligent jurors an unanimous verdict? The oath of the witness, the right of cross-examination, the unanimity of the jury, all rest upon the foundation of immemorial usage alone. It appears to be altogether illogical, admitting the great antiquity of the form of the separation of the jury from the mass of the community in capital cases, to maintain the right of the court to abolish such form, without at the same time admitting the right of the court to retain or set aside, at will, all the other essential circumstances which go to make up the proceedings of a trial at law. But it is enough for us to know that this court has heretofore laid claim to no such power; that it has ever conformed its practice, with implicit obedience, to the ancient usages, leaving to the legislative department of the government the task to modify the law, so as to place it in harmony with the ever shifting conditions of human life. Ascertaining then that the practice in capital cases of keeping the jury, to a certain extent, in privacy during the entire course of the trial, has, with complete uniformity, always prevailed, I feel bound to recognize in such form an institute of law which is wholly beyond the control

of the court, and which belongs to the citizen as of right. I entertain no doubt that in this state, a conviction in a capital case, which should be founded on an order of the court for the jury to disperse during its recess, would be quite as illegal and unsustainable as would be a conviction which should ensue the ruling of the court, permitting a witness to be examined without the test of an oath, or some equivalent sanction.

I conclude, then, that the jury, in a case in which the life of the prisoner is at stake, must, during the continuance of the trial, be kept separate to the extent of the ancient practice; and that this is a requisition of absolute law, and is not, in any measure, a matter resting in the discretion of the court. It would be superfluous, after coming to this result, to enlarge at any length on the evident propriety of the legal form in question, or to do more than advert to its efficacy to keep the jury from the reach of the contagion of that excitement which generally infects the popular mind, during the trial of a person charged with flagitious crime, and its tendency to indicate to the community, and to keep alive in the heart of the jurors themselves, a lively sense of the solemnity and great importance of the office with which they are clothed. These and many similar considerations might be used in vindication of the legal practice under review; but they seem out of place on an occasion when, not the propriety but simply the existence of the form is under discussion. It is the business of courts to ascertain what the law is, not to defend it when ascertained.

Arriving at the conclusion that in a capital case the jury must, during the entire trial, be secluded from intercourse with their fellow men, according to ancient usage, the next inquiry is as to the character and extent of the seclusion required by such usage.

It is a mistake to suppose, that at any age of the law of which we have knowledge, that complete non-intercourse which the rest of the world, under all circumstances, was exacted of a jury during the progress of the trial in a capital

case. This hypothesis has often been set up and has led to much confusion of the subject, but in reality there is no reasonable warrant to affirm, that at any time any absolute and unconditioned isolation of the jury was attempted. At first and for many ages, as it would seem, capital cases were uniformly dispatched at a single sitting, and hence the jury remained during the whole trial under the eye of the court. And it was precisely this which the rule required, *viz.*, that the jury should be kept, while the trial was passing, under the eye of the court, or what is in legal effect the same thing, under the eye of the officers of the court. I think it is not to be doubted, but that any English court at any period of the recorded history of the common law, would, in case of necessity, have permitted intercourse between a stranger and a member of the jury in its presence and hearing, on any subject not connected with the trial. All that the law attempted, all that it could rationally attempt was to prevent the intrusion into the mind of the jury of the sentiments of the community or of some of its members, touching the matter under judicial cognizance. When, therefore, criminal trials, from being the inartificial affairs of a day, became the elaborate business of many days, there was no deflection of the original rule in placing the jury in charge of a sworn officer of the court, with instructions not to permit any communications between the jury and other persons with regard to the case on trial. The principle was to prevent intercommunion between the public or any of its members and the jury, with regard to the question before them—the agency by which this was accomplished being of very little consequence. The truth of this view is strongly evidenced by the proceedings in the case of *The King* v. *Stone*, 6 *T. R.* 527. This trial occurred about the year 1796, and presents the first case in which, in definite shape, the form of proceeding, with regard to the separation of the jury, has come down to us. The proceedings in this case lasted more than one day, so that an adjournment became a matter of necessity, and Lord Kenyon, who presided, permitted the jury to retire to an *adjoining tavern* where accommodations were prepared for them, bailiffs being

sworn "well and truly to keep the jury, and neither to speak to them themselves nor suffer any other person to speak to them touching any matter relative to this trial." An entry of this adjournment was also made in the minutes of the court, showing the necessity of the adjournment, the action taken by the court, and the substance of the oath of the officers accompanying the jury.

These proceedings clearly indicate the views of Lord Kenyon in regard to the essential nature of the legal requirement to keep the jury aloof from contact with other persons; and that view evidently was, that it was the right of the defendant to have the jury secluded under the eye of the officers of the court, so as to prevent intercourse with strangers during adjournments with reference to the trial. This was the utmost reach of the oath prescribed by him to the officers with whom the jurors were put in keeping; it forbade conversation between a juror and a stranger on the subject of the trial, but on no other subjects. It manifests no plan further to isolate the jury. It simply required non-intercourse on the subject of the trial alone. The case just referred to is a leading one and has never been questioned, but has been uniformly followed by the English judges. Nor am I aware that in any English book it has ever been suggested, that the course pursued by Lord Kenyon was a departure from the ancient landmarks. It is certain that the practice thus established was soon adopted in this state, and has invariably been the guide in all protracted trials involving in their issue the life of a citizen. It is true that, a generation since, a few attempts were made in our courts to dispose of capital cases at a single sitting, but the attempt in most instances proved abortive, and in those in which it was successful it was unsatisfactory. For many years past the course has undoubtedly been to pursue substantially the line marked out by Lord Kenyon in the case of *The King* v. *Stone*. The inference from this case and this course of practice seems to me inevitable, that the legal right of the prisoner who is tried for his life is, that the court should put the jury, on an adjournment, in the

keeping of sworn officers, with an injunction to prevent them from holding intercourse with any persons, such sworn officers inclusive, on the subject of the trial. It is not the legal right of the prisoner that the court should go further than this. All restrictions upon the jury beyond this limit are matters of discretion with the court; and if omitted, such omission affords no ground of exception to the conduct of the cause.

From the foregoing view of the topic discussed, it will be perceived that it was entirely competent for the court to authorize the jury or any of them to visit their homes, in the company of one of its sworn officers. So it was equally legal for the court to permit, under the same supervision, the jury or any of its members, to ride or walk out for exercise. All that the defendant can demand as a right is, that the court should not sanction the withdrawal of the jury, in whole or in part, during the trial, from the presence of the court or its officers.

The second position of the counsel of the defendants, taken on the argument, was, that on the assumption that the court possessed the right to give the instructions in question, still it was insisted that the jury and the officers failed to comply with such instructions, and on this account, *ipso facto*, the verdict must be set aside.

In my opinion this position cannot be reasonably maintained. The divergence of the jury or the officers of the court from the line of duty, is susceptible of such an infinity of degrees, the principle would seem to be the most mischievous imaginable which should establish, as an inevitable result and as a rule of law, that on account of any such divergence whatever, the defendant should be entitled to a new trial. For it is to be remembered, also, that not only are the degrees of dereliction of duty infinite, but the variety of circumstances attending each dereliction of duty is likewise infinite; so that no two derelictions, in general character the same, will be even approximately of equivalent enormity. Thus, if the court should forbid to the jury the use of ardent spirits, and a juror in mere wantonness should violate such

order to the point of inebriety, such misconduct would be
vastly greater than the act of one who, under the influence
of slight indisposition, might be induced to partake, to a.
moderate degree, of the forbidden beverage—and yet upon
the rule contended for, the venial offence of the one would
afford as perfect a ground to set aside the verdict as would
the much more reprehensible act of the other.   I cannot but
think that among legal phenomena, few are more strange·
than that this question has been one on which courts have
been much divided—for it would certainly seem, that the·
rule that the misconduct of any member of the jury or any
one of the officers in charge of them, in violation of the·
order of the court as to their seclusion, should *per se*, and
without reference to the effect of such misconduct on the·
verdict rendered, have the effect of a mistrial, would be·
utterly impracticable.   It is perhaps not rash to say, that no·
verdict was ever rendered which would stand this test.   Be-
sides, it introduces into the law an entirely incongruous.
element.   If it be the legal rule, that if the jury or any
member of it violate, in any respect, the instructions of the·
court, a legal right to a new trial absolutely arises, such
legal right should be demandable *ex debito justitiœ ;* whereas,.
in point of fact, the claim can only be presented in the form
of an application for a new trial, which is a matter always.
addressed to the discretion of the court.   That the law affords
no appropriate remedy is a strong ground to challenge the·
existence of the right itself.

After a careful consideration of the general subject and an
examination of the authorities applicable to it, I am satisfied
that the rule laid down in the text books, as the one sup-
ported by the weight of opinion, is correct.   That general
rule is thus stated in *Wharton's Crim. L.*, § 3111, *viz.*, "That
the verdict will not be set aside on account of the miscon-
duct or irregularity of a jury, even in a capital case, unless·
it be such as might affect their impartiality or disqualify
them from the proper exercise of their functions."

The adoption of this rule introduces the third and last

question discussed on the argument, *viz.*, was the conduct of the jury, in this case, or was that of the officers having them in charge, such as may be supposed to have affected their impartiality or disqualified them from the proper exercise of their functions?

It is admitted, that if any ground whatever appears for a belief or even suspicion that such a condition of things existed, a new trial ought to be freely granted.

I shall very briefly advert to the principal acts of the jury, which form the subjects of complaint, and shall state my conclusions with regard to each of them, without attempting to set out in detail the reasons on which such conclusions rest. Disquisitions concerning matters of fact are always tedious, seldom profitable in any view, and never satisfactory to him against whom the argument tends, and for whose benefit alone they are composed.

*First.* It is said the officers were ordered by the court to take the jury to some convenient private place; whereas, they were kept at a public inn—and that this was not a compliance with the duty thus enjoyed.

The testimony shows that, at the inn in question, the jury were provided with private bed-rooms and a sitting-room, exclusively devoted to their use. That they took their breakfast by themselves, but their dinner and tea were set in the public room, but at a table separated a few feet from that of the other guests. The constables having them in charge were always present with them at their meals.

I think this disposition of the jury a fair compliance with the order of the court. The dining-room, under the circumstances, was a "convenient private place," within the true meaning of the judicial order. To ascertain whether a place is private, within the sense of the order, the object of the order must be regarded. The intent was so to place the jury as to prevent their intercourse with persons not upon the jury. Certainly, at the table they were in this sense in a private place. No communication could take place be-

tween them and other persons, which could escape the observation of those having them in charge.

It is next objected that Mr. Felch, one of the jury, went into his house, while the constable having him in charge stayed at the door. The juror was in the house but a very few minutes.

In this instance the constable did not do his duty. He was invited by the juror to go into his house with him and refused, saying it was unnecessary. In that the officer was in fault, and the court undoubtedly should be fully satisfied as to what occurred between the juror, when thus absent from his custodian, and the inmates of the house. The misconduct of the constable shifts the burthen to the state, to prove the good conduct of the juror at the time in question. This burthen is taken up by the state and the result is satisfactory. The juror himself being examined as a witness, says, he saw a carpenter there, in his employ, and his wife, when he was in his house. This is his testimony with reference to what passed touching the trial. " The carpenter said you have a hard time of it on the jury; I said we found it so. My wife asked me when I was going to get clear; I said it was doubtful whether we would get through this week, that being Sunday; nothing was said as to the merits of the case by my wife; my time being occupied in giving directions about business matters." This testimony is entirely uncontradicted, and, in my judgment, it completely clears this point from the least suspicion of this juror receiving any bias ab extra.

Again: it is said Mr. Johnson, another of the jurors, visited his home on three several occasions.

It appears from the proof he had an officer with him on each visit. He was not out of the presence of an officer at either time, with the exception on one occasion when he went into a private room to change his linen. The juror himself proves explicitly, that he had no conversation with any one with regard to the trial. I can see nothing in this conduct which, in any respect, is censurable or irregular.

Again : it is objected that members of the jury, during the continuance of the trial, drank at various times ardent spirits.

I am not aware of any law which prohibits the use of intoxicating drinks to jurors while on duty in a criminal case, even though that case be one in which the life of the prisoner is at hazard. A rule nearly inflexible, as it would seem, against the use of spirituous liquors by jurors, appears to exist in some of the American states ; but such rule is local in its character, having no place in the general maxims of the law, and, as I think, is not recommended by any substantial reasons. It is the abuse and not the use of these dangerous stimulants which the law prohibits to the juryman. It is true, that as this indulgence easily runs into excess, and when this occurs the mental condition of the juror is for the time disturbed, the court, whenever it is shown that intoxicating liquids have been used at all during a trial by any member of the panel, will closely scan the deportment, at all times, of such member ; and if, from such scrutiny, any ground, even the slightest, should appear upon which to found a suspicion that such juror had been, during the course of the proceedings, in any degree intoxicated, a clear case would be presented in which a new trial should be granted to the prisoner. I think the use of spirituous liquors by members of a jury in a capital case, is censurable, except when used medicinally, and then the permission of the court should be obtained. But I do not think that, in the abstract, the mere temperate use of spirituous liquors will vitiate a verdict in any case whatever. In the present instance, the conduct of those members of the panel who, in this respect, have been inculpated, is certainly alleviated, if not entirely excused by the fact that, at an early stage of the cause, their health · was affected by the water which they drank at the hotel. But this part of the case is completely relieved from all suspicion by the circumstance, that no one among the numerous witnesses who have been examined, and many of whom were in constant view of the members of the jury to

whom the imputation under consideration relates, has ven-
tured to breathe an intimation that, in his opinion, any one
of such members, at any time during the continuance of his
official duties, was to the slightest extent intoxicated, or was
in any perceptible degree under the influence of intoxicating
agents—the negative testimony upon their part, was also
of the most conclusive character. Under these circumstances
this objection cannot prevail.

Next it is objected that on two several occasions, expres-
sions of opinion were uttered by strangers to the trial, in the
hearing of the jurors or some of them, touching the merits
of the case.

It appears that during the trial one of the jurors in charge
of the constable went into an oyster saloon. When they
entered a single man was present—two men came in after-
wards—a few words passed touching the trial, between one
of these persons and the woman who kept the saloon. She
said she had heard Dr. Quinby's testimony given in court,
and she did not think it was much in favor of Cucuel. That
if they would leave it to a jury of women they would soon
hang him. The juror and the constable both say they heard
the remark, and at the suggestion of the latter they im-
mediately left the place. They were not in it more than
five minutes.

The other occurrence referred to was the expression of a
wish that the defendant might be hung, made in the dining-
room in the presence of the jury, by a man who was in
liquor.

The twelve jurors have been examined, and it appears that
these are the only intimations of an opinion on the part of
strangers which reached them out of the court-room.

It would be an excessive refinement to suspect that de-
clarations, such as these, could have created the least possible
bias in the mind of any member of the jury. The weakest
intellect could not have been affected by them. In our
anxiety to protect the prisoner we are not to abandon the
sure footing of common sense. I think every man of ordinary

intelligence and experience must feel, to a moral certainty, that from these occurrences the defendant could have received no detriment. That the constable was not justified in permitting the juror to go into a place of public resort is nothing to the purpose; undoubtedly he was culpable and deserved censure, if not punishment, at the hands of the court. But this official misconduct, as we have seen, in order to vitiate the verdict, must be such as, in the light of the circumstances of the case, to warrant the belief that the fairness and propriety of the trial have been impaired. This result is entirely negatived in the present instance.

The next objection was that the newspaper, containing what purported to be a report or abstracts of the evidence introduced at the trial, was seen by two or three of the jurors.

The evidence shows that these jurors read but small portions of these reports. There were no editorial or other comments on the evidence or the merits of the case, in any of the newspapers. There is not the slightest ground to suspect that any juror has been misled by any of the reports. The juror who read the most in them, said they made no impression upon him. The paper containing these reports, was freely used and referred to by the counsel from time to time, before the court and jury.

Under these circumstances the remarks made to the last objection apply fitly to this. The officers were in fault in permitting these papers to go into the hands of the jury; but I am entirely unable to understand how it can be imagined, that the perusal of scraps of evidence in these papers affected, in the least degree, the result of the case. In the case of *The United States* v. *Reid and Clements*, 12 *How.* 361, a motion for a new trial in a capital case was refused, although it appeared that one of the jurors read a newspaper report of the evidence, after the delivery of the judge's charge and during the deliberations of the jury.

The foregoing I regard as the principal grounds for the present motion. I see no force whatever in the criticism

on the conduct of the jury in the other respects referred to, although it is manifest that the officers who had the jury in their custody, did not fully appreciate, or at all events, did not strictly discharge the duty incumbent on them. I have examined and weighed the law, the evidence, and the argument of counsel in this case, with a solicitude natural to the occasion, and with a sincere determination to be satisfied with nothing short of a perfect conviction that the prisoner has, in no respect, been deprived of that impartial and legal trial to which, by the laws of his country, he was entitled. And my conclusion is, that such trial has taken place, so far as appears to this court, and that, therefore, the present motion should be denied.

Motion denied.