Argued April 29; affirmed July 15, 1941

# McCAULEY *v.* PACIFIC ATLANTIC STEAM-SHIP CO.

(115 P. (2d) 307)

Before KELLY, Chief Justice, and BELT, BAILEY and LUSK, Associate Justices.

*Erskine Wood*, of Portland (Wood, Matthiessen & Rankin and Erskine B. Wood, all of Portland, on the brief), for appellant.

*B. A. Green*, of Portland (Green & Boesen, of Portland, on the brief), for respondent.

BAILEY, J. This action was brought by John H. McCauley against Pacific Atlantic Steamship Company, a corporation, to recover damages for an injury to his right eye. From a judgment in favor of the plaintiff the defendant appeals.

The accident in which the plaintiff was injured occurred at New London, Connecticut, on or about February 15, 1938, while the plaintiff, employed by the defendant, was engaged in scraping paint and rust from the under side of the forecastle head deck of the steamship San Bernardino. The plaintiff was furnished no goggles or other protection for his eyes. Particles of materials scraped from the ship got into his right eye and caused multiple corneal ulcers to develop in that eye, greatly impairing the plaintiff's sight.

The complaint charges the defendant with negligence in the following particulars:

"1. In compelling plaintiff to work at scraping said paint and rust, under the circumstances as hereinbefore described, considering the great danger and hazard thereof, under the circumstances as aforesaid.

"2. In failing and neglecting to furnish plaintiff with goggles or other safety devices to protect plaintiff's eyes from said falling dirt, rust and paint, considering the manner in which said work had to be performed, as aforesaid."

One of the appellant's principal assignments of error is based on the refusal of the trial court to direct

a verdict for it as defendant. It is therefore necessary to review the evidence in some detail.

At the time of his injury the plaintiff was an able-bodied seaman in good health, about forty-five years of age. He was then receiving $72.50 a month in wages, with maintenance, and over-time pay of about $25 a month additional. He had been a sailor from 1912 until the time of the accident, excepting an interval during the world war, when he served in the United States army. On January 9, 1938, he signed regular merchant shipping articles on the west coast, for a voyage on the San Bernardino to the east coast and return.

Approximately 70 per cent of the work done by sailors is that of scraping off paint and rust and re-painting the ship. It is customary for the ship to furnish goggles and for the sailors to wear them while engaged in scraping.

The boatswain is the foreman of the sailors. He takes his orders from the first mate, who is also mentioned in the testimony as "chief mate" and "first officer"; and the sailors take their orders from the boatswain. On the San Bernardino there is only one storeroom for such equipment as tools, goggles, cargo hooks, paints and lines which the sailors have occasion to use. The storeroom is located under the forecastle head. In the testimony it is variously mentioned as the "mate's storeroom", "boatswain's locker" and "gear locker". On the San Bernardino it was the duty of the first mate to see that the storeroom was properly supplied, and the boatswain was in direct charge of the room.

When sailors are turned to, meaning put to work, it is customary for the boatswain, if on board, to come forward to the storeroom and issue the gear, which

for scraping consists of wire brushes, scrapers and goggles. On the day that the plaintiff was injured the boatswain was ashore, and the first mate ordered the plaintiff and five or six other sailors to scrape paint and rust from the under side of the forecastle head deck. He gave them the key to the storeroom, to get their equipment. The plaintiff and some of the others looked the storeroom over and were unable to find any goggles. They then proceeded to work without goggles.

As a witness, the plaintiff stated that there were no goggles on the ship. In this connection he explained:

"Previous to that [his injury at New London], about three weeks before, we were coming up the coast, . . . and we were there working on the starboard life boats, scraping the bottoms, and it is a sort of light chips on them there, where you scrape off; we were overhauling the boat. So these chips fell,—they really was active chips; it is hard paint, you know,—you see what I mean; it isn't dead paint like rust would be, . . . So I asked the boatswain, I says, 'How about a pair of goggles?' So he says, 'I don't believe there is any goggles on the ship.' Well, we got through with the job the best we could and painted the boat.''

The under side of the forecastle head deck, which the plaintiff and others were told to scrape, is about nine or ten feet high, and in order to reach it they had to stand on hatch boards laid on boxes. A pointed hammer was used to chip the paint, which was then scraped. In describing the work, the plaintiff thus testified:

"First the bad stuff we work off. They have a long-handle scraper like the,—like a hoe with a straight edge to it and it is pointed on one side. Well, you scrape that rust to get the worst off. A cloud comes down as soon as you touch it, and then to get a thorough job

you have to get in there with a short scraper, a twelve or fourteen inch scraper, twelve inch scraper, and then you have to get close to it.''

With reference to the manner in which he was injured, the plaintiff gave the following testimony:

''Q. Then what, if anything, happened to you in— did you sustain any injury? Describe just what did happen. A. I had been working down there, it was close to ten o'clock, and the rust coming down in my face; we were working kind of close together, all of us, and it had been falling in our faces and we would wipe it off the best we could, and we had no goggles. I looked for goggles that morning, looked forward,—

''Q. (Interrupting) Just a minute; describe what happened to you. A. Well, the dust and rust and everything else kept falling down on our heads and faces, so we,—it got in my eyes, got pretty bad, and started to burning and—I think it was coffee time; we have coffee at sometime around ten o'clock,—and around coffee time,—I think it might have been a little after, I went to the second officer; he was a medical doctor on the ship, took care of the medical chest.''

The second officer washed the plaintiff's eye. The first mate also was present, and the plaintiff then remarked that ''it was a pretty tough job without goggles.'' In this connection his testimony was as follows:

''Q. To whom did you mention that? A. I mentioned that to the second officer and the first officer. Q. Is that when the second officer was fixing your eye? A. Yes, and the mate was standing right there. ''Q. What was the reply to that? A. He didn't say nothing. Q. Either one of them? A. Neither one of them; the second mate was busy with me. ''Q. Did you make that to the chief mate? A. I made that to the chief mate, it was a tough job and there was no goggles. Q. Who did you make that statement to? A. Chief mate.

"Q. That was while the second mate was working on you? A. That was while the second mate was working on me, yes."

The plaintiff further testified that after his eye was washed by the second mate, at New London, he went back to work and continued working for the remainder of the day. That night his eye "started burning" and he was unable to sleep because of pain and the continuous watering of that eye.

The next day he requested of the first mate and was given a hospital slip. He then went ashore and consulted a physician, who told him, "You are okay", and gave him some eye-wash to be used numerous times a day. This physician was connected with the United States public health service. He testified by deposition that he removed a "foreign body" from the plaintiff's eye and prescribed treatment.

From New London the ship went southward, docking at New York, Philadelphia and Baltimore. The plaintiff testified that during that time his eye infection grew worse, but he did not go ashore for medical treatment. He did, however, use the eye-wash frequently, as directed, with the second mate's assistance.

When the ship reached Savannah, some three weeks after leaving New London, the plaintiff's eye was in such bad condition that he obtained another hospital slip, went ashore and consulted a doctor in charge of the marine hospital in Savannah. His ailment was then diagnosed as corneal ulcer, and he was advised by the doctor to leave the ship and enter that hospital. The plaintiff remonstrated, for the reason that the hospital had a bad reputation among sailors, and asked the doctor if he could remain on the ship and go to the west coast. The doctor replied, according to the plain-

tiff's testimony, which in this respect is contradicted by the doctor's deposition, that he believed that the plaintiff would be able to reach the west coast without additional injury to his eye. He also prescribed treatment and furnished the plaintiff medicine for his eye.

The San Bernardino reached Colon, Panama, about five or six days after leaving Savannah. At Colon the plaintiff entered a hospital and remained in it from March 17, 1938, until April 27 of the same year. When he left the hospital his eye was healed but, in his own words, "The sight wasn't so much. * * * I couldn't see at all out of it,—well, only a blur or so."

From Colon the plaintiff returned to Portland, Oregon. On June 3, 1938, he was there examined by an eye specialist, who testified that the plaintiff had sustained a fifty per cent loss of vision of his right eye. On June 13, following, this action was started.

The plaintiff was thereafter employed on numerous ships. About a year after he was injured at New London he signed on the Illinoisian for a voyage from the west to the east coast and return. While he was on that ship, proceeding down the coast toward the Panama canal, and off Nicaragua, his right eye began to trouble him. No new injury, he testified, caused this recurrence of his ailment. He described the difficulty thus:

"Well, I was working, and all of a sudden I felt as though I had a sty in it. The captain says, 'I think you got a sty on your eye.' It was no sty, it was in the cornea. He looked at it and he thought it was a sty but it was the ulcer come back."

The plaintiff remained on board the Illinoisian until it reached Jacksonville, Florida, treating his eye with the help of the chief officer. From Jacksonville he went

by train to Baltimore and there remained in the Johns Hopkins hospital for about two months. When he left the hospital the sight of his right eye was "practically nil", as explained by him, and the eye was much worse than it had been when he was discharged from the hospital at Colon.

At the time of the trial the vision in his right eye was, according to one of the expert witnesses, "slightly less than twenty, two hundred. In other words, it is, for industrial purposes, considered one hundred per cent loss. As an actual fact, it is,—if the good eye were blind, he would have perhaps ten per cent, an estimate of ten per cent vision in that eye, in the right eye." One of the expert witnesses testified that in his opinion the recurrence of the ulcerous condition of the plaintiff's eye during his voyage on the Illinoisian was a direct result of the injury he suffered at New London.

About a year and a half or two years prior to the plaintiff's being injured at New London, he had been hospitalized in Honolulu for treatment of his right eye. On the way to Honolulu a steel splinter had entered that eye, due to an accident on board ship. The splinter was removed, and a corneal ulcer of the right eye developed, caused by the injury. The plaintiff on that occasion remained in the hospital about seven weeks. When he was discharged his eye "was well, it didn't hurt the vision whatever". He had no further trouble with that eye until the New London incident. There was expert medical testimony to the effect that there appeared to be no causal connection between the earlier corneal ulcer and the plaintiff's multiple corneal ulcers of 1938.

A matter on which the defendant placed a great deal of stress was the plaintiff's testimony that when

ashore he did at times drink intoxicating liquor. When questioned as to the extent of such drinking the plaintiff thus testified:

"A. Well, it is sailor style. The first night is always the worst. We generally,—we didn't make a mess out of ourselves, but for five or six hours we turned the ship and the next day we were working.

"Q. Is that about the size of your drinking? A. Well, if we have any money left the next night, we do the same thing. Q. Your money is usually gone? A. Our money is usually gone.

"Q. Are you a steady drinker? A. No, sir, I am not."

He further testified that he was ashore about three times between leaving New London and arriving at Savannah, and that only one night, in Philadelphia, did he drink any intoxicating liquor.

██ This action was brought under the merchant marine act of 1920, known as the Jones act, 46 U. S. C. A. § 688. The federal employers' liability act, 45 U. S. C. A. §§ 51 to 59, is incorporated in the Jones act: *The Arizona v. Anelich*, 298 U. S. 110, 80 L. Ed. 1075, 56 S. Ct. 707. Under the federal employers' liability act, contributory negligence of an employe does not bar recovery, but it is ground for apportionment of the damages between employer and employe: *The Arizona v. Anelich*, supra; *Beadle v. Spencer*, 298 U. S. 124, 80 L. Ed. 1082, 56 S. Ct. 712. Assumption of risk is not a defense to an action brought under the Jones act for failure of the master to provide safe appliances or a safe place in which to work: *The Arizona v. Anelich*, supra; *Beadle v. Spencer*, supra.

■ Inasumch as this action was brought under the Jones act, it is governed by the rule of the federal courts that the negligence of the defendant must be

established by substantial evidence: *Lieflander v. States Steamship Company*, 149 Or. 605, 42 P. (2d) 156; *New Orleans & N. E. R. Co. v. Harris*, 247 U. S. 367, 62 L. Ed. 1167, 38 S. Ct. 535; *Gulf, Mobile & N. R. Co. v. Wells*, 275 U. S. 455, 72 L. Ed. 370, 48 S. Ct. 151. The provisions of § 3 of article VII of the Oregon constitution are not here applicable: *Christie v. Great Northern Railway Company*, 142 Or. 321, 337, 20 P. (2d) 377.

■ Three reasons are assigned by the defendant in support of its motion for a directed verdict. The first is that there is no evidence that the first mate of the San Bernardino knew that goggles were not to be found in the boatswain's locker or had reason to suppose that the men would work without goggles, and that before negligence can be charged to the defendant through the first mate, "it would have to appear that the mate ordered the men to work, knowing or having reason to believe, that they would have to do so without goggles."

The evidence discloses that the San Bernardino sailed on or about January 9, 1938, from the west coast; that the plaintiff's injury did not occur until about February 15; that 70 per cent of the work of seamen is scraping and repainting the ship; that on the voyage not any of the men so employed were furnished goggles; that prior to the plaintiff's injury, goggles were requested of the boatswain and he replied that he did not believe that there were any goggles on the ship; and that when the plaintiff's eye, after it was injured, was being washed by the second mate in the presence of the first mate, the plaintiff said to them that it was a "tough job", to do the scraping without goggles, yet the first mate did not say that there were goggles

available, but permitted the men to continue such work without protection to their eyes. Moreover, there was undisputed evidence that it was the duty of the first mate to see that the storeroom was supplied with goggles and other necessary equipment. There was further testimony that the plaintiff and some of the other seamen before going to work on the morning of the plaintiff's injury made a search for goggles in the storeroom and were unable to find any.

The defendant does not seriously contend that there were goggles in the storeroom at that time. It does, however, assert that the evidence is undisputed that there were twelve sets of goggles in an unopened carton under a settee in the first mate's stateroom.

The only evidence concerning the twelve pairs of goggles in the first mate's stateroom was the testimony of the second mate, who first stated that he had no knowledge of those goggles except from what was shown by the chief officer's account of stores. Later, he testified that he had seen the carton containing the goggles. Neither the first mate nor the boatswain was called as a witness, and no reason was given for not taking their testimony either in court or by deposition.

The United States circuit court of appeals for the ninth circuit, in *Partos v. Pacific Coast Steamship Company*, 95 F. (2d) 738, quoted with approval from its opinion in a prior case (*Pacific American Fisheries v. Hoof*, 291 F. 306) as follows:

" 'The duty of the master to provide a safe working place and safe appliances is a positive and continuing one, and can not be delegated. It was claimed on the trial that it was the duty of the appellee to inspect the ladder in question, but the court below found otherwise, and of that finding there is no complaint. If that duty did not devolve upon the appellee, it devolved upon

some one else, and whoever discharged that duty represented the master, and his negligence was the negligence of the master. *When the working place and appliances are unsafe, it is no answer to say that they were rendered unsafe at some previous time by the act of another servant. As already stated, the duty is a continuing one, and notice of defects and dangers will be imputed to the master where they could have been discovered by reasonable inspection and by the exercise of reasonable care.'* (Italics supplied.)''

See also *Pittsburgh Steamship Co. v. Palo*, 64 F. (2d) 198.

In the instant case the master and those under him in charge of the work knew or should have known that the plaintiff and other seamen were engaged in work endangering their eyes and were not protected by goggles. They knew or should have known that goggles were not in the storeroom and therefore were not available to the seamen. The injury which the plaintiff suffered was reasonably foreseeable by the defendant's officers.

The facts in this case are essentially different from those in the cases relied upon by the defendant. In *Chesapeake & Ohio Ry. Co. v. Mihas*, 280 U. S. 102, 74 L. Ed. 207, 50 S. Ct. 42, Mihas was employed by the railway company to care for switch lights and lamps along the right of way. He was familiar with the company's switching operations. On the morning of his injury he proceeded from his home across the tracks to get the speeder car, and on his way attempted to climb over a coal car standing on a switch track with other cars. While he was doing so a string of cars, by means of a flying switch, was forcibly propelled against the standing cars with such violence that Mihas was thrown between two cars and severely injured.

The opinion stated that there was nothing in the record "to show that employes engaged in the switching operation knew or had reason to believe that Mihas was in any position of danger. In the absence of such knowledge or ground for belief, they were not required to warn him of the impending switching operation or take other steps to protect him."

The next case relied upon by the defendant is *Aerkfetz v. Humphreys*, 145 U. S. 418, 36 L. Ed. 758, 12 S. Ct. 835. The plaintiff therein was employed in the switch yard of the railroad company of which the named defendant was a receiver, and was working on a track. He had been employed by the railroad for about eighteen months and was familiar with its switching operations. While he was so engaged, "a switch engine pushing two cars moved slowly along the track upon which he was at work, the speed of the engine being about that of a man walking. Plaintiff stood with his back to the approaching cars, and so remained at work without looking backward or watching for the moving engine until he was struck and run over by the first car." The court held that under the facts in the case negligence could not be attributed to those in control of the train or the management of the yard; that the cars could not have been moved more slowly; and that those in charge of the train were not bound to assume that any employe familiar with the manner of doing business would be wholly indifferent to the going and coming of the cars. The opinion also stated that even if by any means negligence could be imputed to the defendants, "surely the plaintiff by his negligent inattention contributed directly to the injury." The case was decided in 1892, and the federal employers' liability act was not passed until 1908.

*Pittsburgh Steamship Company v. Palo,* supra, involved an accident to a seaman at work on a ship. In performing a task required of him the sailor used a ladder provided for the purpose. He had no trouble with the ladder on the starboard side, but when he took it to the port side he ''couldn't get it to stand level on account of the plates [upon which it rested] overlapping''. When he started to climb the ladder, it slipped to the right, throwing him off balance and causing the injury for which he sued. It was held that under the facts in the case the defendant could not have reasonably apprehended danger of the injury sustained by the plaintiff and therefore was not liable.

The second ground for the granting of its motion for a directed verdict urged by the appellant in its brief, with italics for emphasis, is that, ''The proximate cause of plaintiff's injury was *his own inexcusable neglect* in not reporting back to the mate and asking for goggles when, as he says, he could not find any in the storeroom.'' It is further stated that, ''This is not a question of assumption of risk. It is a simple question of where lies the negligence.''

It has hereinbefore been pointed out that the officers of the ship knew or should have known that the seamen were not wearing goggles while scraping and that there were no goggles available to them in the storeroom where they should have been kept. In *Masjulis v. United States Shipping Board Emergency Fleet Corporation,* 31 F. (2d) 284, the plaintiff was injured through the breaking of a rope. In charging the jury the court stated that ''if the plaintiff knew the rope was in faulty condition and, knowing the danger, voluntarily used it for the purpose of being raised, he assumed the risk and could not recover.'' In holding

that the trial court erred in submitting to the jury the question of assumption of risk, the circuit court of appeals for the second circuit said:

"As was pointed out in the Johnson case, *supra* [Panama Railroad Co. v. Johnson (C. C. A.), 289 F. 964], there is such an obligation upon a seaman to obey the orders of his superiors that he can not have the freedom of action which lies at the base of the doctrine of assumption of risk as applied to workmen on land. On this subject the following language is quoted from the opinion in Storgard v. France & Canada Steamship Corporation (C. C. A.), 263 F. 545:

" 'The common-law rules do not apply to this relation of master and seaman. It is intimate and peculiar, and differs from that between shore master and servants, who may at any time withdraw from service and refuse to use tools and appliances which they think dangerous.'

" 'The charge given put the plaintiff where he would be at the disadvantage of having to decide between assuming the risk of injury caused by defective appliances, due to the negligence of his superiors, or of assuming the risk of disobedience to the order of his superior officer, with whatever consequences that would entail, and in either event of assuming the risk of his choice. This in effect gave to the defendants a distinct defense to the action, to which under the law they were not entitled."

The position in which a sailor finds himself while at sea is well described in *South Atlantic Steamship Company v. Munkacsy*, 37 Del. 580, 187 A. 600, thus:

"The contract of a sailor always has been regarded as exceptional, involving, to an extent, the surrender of personal liberty during the term of the contract. The business of navigation could not be carried on without some guaranty, beyond the ordinary civil remedies on the contract, that the sailor will not abandon the vessel in some crisis. A seaman aboard ship is

bound to perform such services as may be required of him in his employment. He can not hold back and refuse prompt obedience because he may deem the appliances faulty or unsafe. Masters of ships possess large powers and they may lawfully compel obedience to orders. A seaman is never at liberty, like a landsman, to quit or make much objection to the circumstances surrounding the work commanded. Disobedience is criminal, and seamen have the corresponding right to protection against needless exposure. They are not required to vindicate their right to security by refusal to work at the risk of being put in irons or going to jail." [Citing authorities.]

In answering the contention of the steamship company that the sailor was not under compulsion to do the work in which the accident occurred, the court therein observed:

"The plaintiff in error admits that perhaps it is not necessary that there be an actual protest on the sailor's part and a peremptory command to go on. Cases might arise, as it says, in which a sailor might consider that a protest would be a useless gesture, and in which he would testify that he went ahead unwillingly, although he knew that the work was dangerous. It admits that it has found no such cases in the reports, and we agree that such cases might arise. But it seems to us that metaphysical subtlety has little place in its application to a sailor at sea, accustomed as he is by sense of discipline to instant obedience. An order or command implies an imperative direction to do or refrain from doing something. The sailor understands that all orders must be obeyed. Certainly it is not necessary that the language of the command be threatening, intimidating or violent. All that is necessary is that the will of the officer, or person in charge, be made known to the sailor."

In *Socony-Vacuum Oil Company v. Smith*, 305 U. S. 424, 83 L. Ed. 265, 59 S. Ct. 262, it was contended that

the seaman who brought the action had used a defective appliance, knowing that a safe one was available. The court, in ruling that assumption of risk was not a defense, went on to say:

"We think that the consistent development of the maritime law in conformity to its traditional policy of affording adequate protection to seamen through an exaction of a high degree of responsibility of owners for the seaworthiness of vessels and the safety of their appliances will be best served by applying the rule of comparative negligence, rather than that of assumption of risk, to the seaman who makes use of a defective appliance knowing that a safe one is available."

There is no merit in the defendant's contention that the proximate cause of the plaintiff's injury was "his own inexcusable neglect" and that therefore the defendant is not answerable in damages. The defendant admits that the plaintiff is not precluded from recovery on the ground of his assumption of risk, but asserts that the record fails to disclose any evidence of negligence on the part of the defendant, inasmuch as had the plaintiff reported to the first mate his inability to find goggles, that officer would have supplied them. There is substantial evidence in the record from which the jury could have found that the defendant knew or should have known that there were no goggles available to the plaintiff and therefore was negligent in ordering the plaintiff to proceed with his work without being equipped with goggles. Moreover, under the authority of *Socony-Vacuum Oil Company v. Smith*, supra, any negligence of the plaintiff in this respect would affect only the amount of his recovery.

■ It is further urged by the defendant that its motion for a directed verdict should have been granted

because the plaintiff's corneal ulcers might have resulted from any of a number of causes, and for the jury to find from the evidence that they resulted from the injury which the plaintiff suffered at New London would be to base a conclusion on speculation, rather than facts. This was not suggested to the trial court, however, as one of the grounds for granting the defendant's motion, and it can not now be considered, because raised for the first time on appeal.

■ The next assignment of error is based on the refusal of the trial court to strike the plaintiff's testimony relative to wearing glasses. In this connection, the plaintiff testified that after his accident in 1936 he had experienced no trouble with his eyesight until the accident that happened at New London in 1938; and that at the time of the trial he had to wear glasses for reading, but had not been obliged to wear them prior to his injury in 1938. The plaintiff did not claim that his left eye was injured in the New London incident, but he did contend that in order to preserve the efficiency of that eye it was necessary for him to wear glasses. The fact that the plaintiff did not have to wear glasses until after the New London incident did have some bearing on the condition of his eyes after his accident in 1936. At the time counsel for the defendant made his motion, the attorney for plaintiff stated that he was not claiming that his left eye was injured at New London. No error was committed by the trial court in denying the defendant's motion.

■ Error is assigned because of the refusal of the court to sustain the defendant's objection to numerous questions propounded on cross-examination to Dr. Lucas, an expert medical witness called by the defendant. In this connection it is asserted by the defendant

that the cross-examination was not limited to the issues in the case and involved matters concerning which there was no evidence. In the cross-examination of expert witnesses much latitude is allowed. The extent of such examination is largely within the discretion of the trial court, subject, however, to review if abuse of that discretion is shown: *Burrowes v. Skibbe*, 146 Or. 123, 29 P. (2d) 552; 2 Nichols, Applied Evidence, page 2079, § 81.

In *Duggins v. International Motor Transit Co.*, 153 Wash. 549, 280 P. 50, the court quoted with approval from Jones Com. on Evidence, § 1342 as follows:

" 'The inquiry on cross-examination should be allowed as wide a range as may be reasonably necessary to test the skill and reliability of the witness. The extent to which the examination may go in respect to such collateral matters rests in the sound discretion of the court, and the exercise of such discretion will not be reviewed on appeal, unless abused. * * *' "

The opinion thus continued:

"We said in Levine v. Barry, 114 Wash. 623, 195 P. 1003, 1006, that: 'The expert witness, because of his superior knowledge of the subject about which he is testifying, may be a very useful or a very misleading, or even dangerous, witness, and as to him the rules of cross-examination should be liberalized rather than restricted,' having in mind the general rule that on the cross-examination of an expert witness '* * * the cross-examiner may rightfully propound hypothetical questions based entirely on conjectural facts *for the purpose of testing the skill and knowledge of the witness.*' "

See also, in this connection, *American Pacific Whaling Co. v. Kristensen*, 93 F. (2d) 17; 2 Nichols, Applied Evidence, page 2081, § 87; Mundo, The Expert Witness, page 72, § 25.

■ It is our opinion that there was no abuse of discretion on the part of the trial court in not sustaining the defendant's objection to certain questions asked Dr. Lucas on cross-examination. Much latitude was allowed by the trial court in the direct examination of the expert medical witnesses as to the causes of corneal ulcers. Some of the cross-examination of Dr. Lucas had reference to his direct examination in that respect, while other questions were asked for the purpose of testing his skill and knowledge.

■ The fourth assignment of error is based on the trial court's submitting to the jury the issue of "whether the defendant had 'compelled' the plaintiff to go to work without goggles". The defendant asserts that not only is there no evidence that the defendant compelled the plaintiff to work without goggles, but there is the positive testimony of the second officer that there was no compulsion on the seamen to work without proper equipment. From the testimony hereinabove referred to, the jury could find that the plaintiff was compelled to work without being provided with goggles. What amounts to compulsion as applied to sailors aboard ship is shown by the excerpts quoted from *Masjulis v. United States Shipping Board Emergency Fleet Corporation*, supra, and *South Atlantic Steamship Company v. Munkacsy*, supra. See also *Reskin v. Minnesota-Atlantic Transit Co.*, 107 F. (2d) 743. In view of these authorities, the court did not err in submitting to the jury the question of compulsion.

■ The fifth and last assignment of error is based on the failure of the trial court to hold that the verdict of $6,000 was excessive. In passing upon this question we are not controlled by § 3 of article VII, Oregon constitution: *Christie v. Great Northern Railway*

*Company*, supra; *Wychgel v. States Steamship Company*, 135 Or. 475, 296 P. 863. In the latter case, brought under the Jones act, this court, without finding any reversible error, reduced the amount of the judgment as excessive.

With reference to the contention that the verdict in *Smith v. Socony-Vacuum Oil Company*, 96 F. (2d) 98, was excessive, the court therein said:

"Objection was also made to the awards for negligence and for maintenance and cure on the ground that each was excessive. There was proof of some damage under each count, and this court is without power to reduce the verdict."

On appeal to the United States supreme court (*Socony-Vacuum Oil Company v. Smith*, supra), that court did not directly pass upon the authority of the circuit court in that action, brought under the Jones act, to determine whether the verdict was excessive. It did, however, say this: "The power of a trial judge to guide and instruct the jury and his control over excessive verdicts afford as adequate a protection to owners as in any other case where the negligence of the seaman, whatever its degree, has contributed to an actionable injury."

The circuit court of appeals in *Nolan v. General Seafoods Corporation*, 112 F. (2d) 515, stated that the denial of a motion for a new trial on the ground of excessiveness of the verdict is discretionary with the trial judge, and found no abuse of such discretion.

It would seem that this court, in passing upon the question of excessiveness of the verdict in an action brought under the Jones act, should accord to the trial court's determination of that matter as much consideration as given by federal appellate courts to similar

rulings of federal trial judges. In the case at bar the circuit court denied the motion for a new trial on the ground of excessiveness of the verdict, and we find no abuse of discretion in that ruling. We can not say as a matter of law that the verdict was excessive. The evidence was sufficient to support the award of the jury.

We are of the opinion that no error was committed by the circuit court, and the judgment appealed from is therefore affirmed.

BELT, J., did not participate in this decision.