STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. IDA PONTERY, DEFENDANT-APPELLANT.

Argued September 7, 1955—Decided October 17, 1955.

458

*Mr. Frank G. Schlosser* argued the cause for appellant.

*Mr. John D. Collins,* Morris County Prosecutor, argued the cause for the State.

The opinion of the court was delivered by

WACHENFELD, J.    The defendant, Ida Pontery, was indicted in statutory form by a Morris County grand jury for the murder of her husband, Dr. Herbert Pontery.  After a protracted trial, she was found guilty of manslaughter and sentenced accordingly.

She appeals and submits for consideration alleged trial errors embracing the failure to sequester the jury, errors in the admission and rejection of testimony, alleged compulsion by the trial court of a verdict by a hopelessly deadlocked jury, errors in the charge to the jury, and in denying a new trial after the defendant's daughter had admitted swearing falsely at the trial.

The factual situation varies with the version accepted as there are sharp conflicts in many aspects, but the following is a fair resumé from the record.

At the time of the shooting causing Dr. Pontery's death, he had been married to Mrs. Pontery, the defendant, for over 26 years. One child had been born of the marriage, Doris, who was then 23 years of age. Doris had graduated from junior college and secretarial school. She lived at home with her father and mother until they separated.

Mrs. Pontery also had a son, William, by a previous marriage who was then 40 years of age. He was a member of the Port Authority police, married, and lived in his own home.

Dr. and Mrs. Pontery maintained two homes, the main residence in Jersey City, where the doctor had his office, and a summer home at Drakestown, near Budd Lake, New Jersey, where the shooting occurred. The doctor's practice, ethically questionable, was nevertheless financially successful, while Mrs. Pontery is described by her counsel as independently wealthy.

In February 1954 the Ponterys separated and the wife moved into a three-room apartment in Cliffside. Suit for separate maintenance was instituted by her against her husband and temporary alimony allowed. The daughter, Doris, remained with her father.

At the beginning of July 1954 Mrs. Pontery moved into the summer home and remained there alone until August 2, when Monseigneur Monteleone, a close friend of the family, arrived at the summer home to spend his vacation in a bungalow located upon the premises, which was his custom.

A few days thereafter, on August 6, Dr. Pontery, Doris and William arrived at the summer home. They entered the kitchen, Doris carrying a package of food.

Irreconcilable conflict in the testimony of the witnesses beclouds the events from this point on until the shooting on the next day. The son and the daughter testified on behalf of the State that when they entered the house, Doris started to put some food into the refrigerator. Their mother entered

the kitchen and told Doris to stop, calling her a "dirty little bitch" and striking her. Dr. Pontery and William intervened and Mrs. Pontery went into another room and made a telephone call to a lawyer. Later she returned and a truce was declared. The family joined in dinner that evening and apparently no further outward manifestations of hostility were then exhibited, but the next day did not conclude so fortunately.

According to Doris and William, the family had breakfast together the next morning. The doctor and daughter left to do some errands and William visited friends living nearby. They returned at about noon and Doris prepared frankfurters for a picnic lunch in the yard. Doris went outside and the doctor emerged from the house carrying an electric saw which had been given him by his wife some time before. The wife angrily inquired as to what he was going to do with it and upon the doctor's reply that he was going to put it in the tool shed, she remonstrated with him, took the saw away and walked into the house. The doctor followed her and stood in the kitchen talking to the Monseigneur, who was stirring soup at the stove. William, who was outside, entered the house a few moments later and Doris followed him in. Mrs. Pontery, it is said, came into the kitchen from the direction of her bedroom, pointed a revolver at the doctor and fired. The bullet struck him near his left arm-pit and he fell to the floor and died minutes later.

William, testifying for the State, said he and his sister were in the kitchen at the time of the shooting. He yelled to his sister to run, that their mother had a gun. He said he ran out of the house and then to the home of a nearby neighbor named Young, informed him what had happened and asked that the police be called.

Doris testified she ran out of the house ahead of her brother, toward the station wagon, which was parked in the yard, with the intention of escaping. She said her mother emerged yelling from the house and started shooting at her. She dodged behind a parked car and Mr. Young, the neighbor, came up and disarmed her mother. She then returned

to the house and discovered her father was dead. She ran out and beat her mother over the head with her fists, inflicting a scalp wound.

Mrs. Pontery's version as to what occurred was otherwise. She testified that when Dr. Pontery, William and Doris entered the house on August 6, her son William announced, "Hitler is dead. We are here to stay." She said she went into her bedroom to call her lawyer. When she returned, Doris was putting a melon in the refrigerator and she asked her not to do so because it would taint the other food in the refrigerator. Doris became angry and proceeded to strike her about the head and side of the neck. She pleaded unsuccessfully with her son to stop her but he stood by and did nothing. She ran into the bedroom and cried.

Her view of this first incident was supported by Monseigneur Monteleone, who, although not present, testified by deposition that when he came into the house later on he saw Mrs. Pontery with a mark on her neck and a lump on her head and she told him, in the presence of her son and daughter, that Doris had beat her. And immediately after her arrest, while she was in a hysterical state, she related to police officers a story of having been beaten by her children. A doctor who examined her following her arrest found two large bruises on Mrs. Pontery's neck, and smaller bruises and painful areas elsewhere on her body, all of which he diagnosed as traumatic injuries.

According to Mrs. Pontery, the family watched television for a while that evening and then the Monseigneur returned to his bungalow with Dr. Pontery. The wife said she had a conversation in the living room with her son William, who complained to her about his lot in life, claiming the mother had always favored Doris, and demanded a large sum of money from her.

On the following day, she arose early and cooked breakfast and was joined by her husband for a cup of coffee, although he would not drink what she had prepared, preferring to make his own. Dr. Pontery washed the station wagon and he, Doris and William left.

Later that morning Dr. Pontery came in and asked her where the electric saw was and she took him downstairs and showed him its location. She then went upstairs and Dr. Pontery carried the saw and a sander outside.

She spent the rest of the morning doing housework and preparing a chicken which she intended to serve to the entire family. When dinner was ready, she went outside to call them and upon seeing the tools in the station wagon, she took them out and carried them into the house.

Mrs. Pontery said she went outside again to call them and was standing on the porch when the son came up and started to beat her violently and threw her into the kitchen. Her husband entered and started to yell at her and beat her about the head and chest. She said the Monseigneur, who was also in the kitchen, intervened and she ran into the bedroom. This was confirmed by the Monseigneur, who says he saw the son striking Mrs. Pontery on the porch, after which either the son or Dr. Pontery picked Mrs. Pontery up by the neck and threw her into the kitchen, kicking her in the back as he did so. The doctor followed her in and began beating her in the kitchen. The Monseigneur testified he grabbed his arm and told him to let her alone but the doctor said he was going to give her a good beating. "I am going to finish her." Mrs. Pontery, according to his version, broke away and ran into the bedroom.

She said she was desperate and cornered and wanted something to protect herself with. She remembered an old revolver in Dr. Pontery's dresser drawer in his bedroom, went there, got the gun and emerged into the dining room. It was her intention, she said, only to protect herself and to scare the doctor and the children. She insisted that when she came into the dining room the doctor grabbed her hands and a struggle ensued which carried them into the kitchen; while they were wrestling in the kitchen, the revolver accidentally discharged, the shot ricocheting off the ceiling. The struggle continued and a second shot went off, killing her husband.

She further testified that when her husband slumped to the floor, William yelled to Doris to run to the station wagon and get his gun. Both Doris and William ran out and when Mrs. Pontery emerged from the house, Doris fired several shots at her but missed. Later, after Mr. Young had disarmed her, Doris emerged from the house and hit her over the head with a gun, knocking her down.

The Monseigneur was 78 years of age, in bad health, and too ill to testify at the trial and his testimony was taken, as already indicated, by deposition.

Following the rendition of the verdict by the jury and on the day set for sentence, Doris, the daughter, appeared in court and allegedly confessed to having committed perjury during the trial. She said that immediately before the shooting, her brother had in fact beat her mother, severely enough to cause her to fall to the floor, and that she had helped her mother to her feet before she ran into the house. She also testified that after the shooting her brother told her not to tell the police he had beat up his mother and in return he would not tell them that she had fired at their mother with his revolver, she having denied at the trial that she fired any shots at her mother. On this recantation of testimony, she still denied having seen her father strike her mother on the day in question, and she also denied having hit her mother on the previous day.

It was upon this factual development that a motion was made for a new trial on the basis of newly discovered evidence. The motion was denied, of which more hereafter.

### FAILURE TO SEQUESTER THE JURY

After the jury had been selected, the prosecutor announced in open court that the State was not demanding the death penalty. The trial judge thereupon suggested it might not be necessary to sequester the jury under those circumstances and asked the defendant's view. Counsel for the defendant at the trial, among other things, said, so long as the State was not seeking the death penalty, "I see no reason why the jury

should be sequestered," and justice could be done without it. The court then queried the prosecutor on his view and he insisted the jury be sequestered. The court implied it would accede to the prosecutor's suggestion. Counsel for the defendant then again called the court's attention to the fact that "this may be a long and protracted trial and the sequestration of the jury would be expensive * * *" and he "urged" the court to exercise its discretion against sequestration. The court refused to do so in face of the expression by the prosecutor to the contrary.

In his formal opening to the jury, the prosecutor again stated: "The State is not demanding the death penalty in this case."

At the close of the testimony on the first day, the trial judge announced he had consulted with the attorneys on both sides and "they have both indicated that they have no objection if I was to permit you ladies and gentlemen to go home rather than be sequestered every day and every night. * * * So that you ladies and gentlemen can retire to your homes each night and come back here in the morning." He also warned them against discussing the case with anyone and gave other protective instructions which are not in issue.

The defendant, on appeal being represented by another attorney, submits that the court erred in failing to have the jury sequestered. In substance, she asserts this was a capital case and the defendant had a fundamental right to have the jury sequestered. *State v. Cucuel*, 31 *N. J. L.* 249 (*Sup. Ct.* 1865) ; *State v. O'Leary*, 110 *N. J. L.* 36 (*E. & A.* 1933). Although the procedure followed was not objected to by the defendant but, indeed, was the result of defendant's solicitation and request over the prosecutor's initial objections, it is insisted we should take notice of it as plain error under *R. R.* 1:5–1(*a*).

The first inquiry is whether or not this remained a capital case in face of the fact that the prosecution announced in open court it was not seeking the death penalty.

Relying upon the *O'Leary* case, *supra*, the defendant says the waiver of the death penalty by the prosecution was not

binding upon the jury, that the indictment alone controls in determining whether it is a capital case. The defendant contends:

"While the prosecution waived the death penalty in its opening and summation, the jury could have ignored the waiver, as it could have ignored the court's charge forbidding the death penalty."

In this respect the court charged:

"So that if you did not make the recommendation of life imprisonment, it would carry the death penalty, but in this case you cannot render such a verdict. If you find a verdict of murder in the first degree, it must be with a recommendation of life imprisonment."

■ We think there was error in the court's so charging. The case, by our adjudications, remained a capital one. *State v. King*, 106 *N. J. L.* 338 (*E. & A.* 1930). Although the prosecutor had a right to waive the death penalty and so inform the jury, the jury nevertheless had the prerogative, if it decided to exercise it, under the statute, to return a verdict carrying with it the extreme penalty. The likelihood of its ever doing so, although remote, did not give the court the right to charge as it did. The court could properly have charged the jury that under these present circumstances it would assume, as did the prosecutor, that the death penalty would not be returned as it was not asked for, but the jury could not be stripped of its right to do so given by the Legislature.

The question of sequestration of the jury has of recent date assumed increasing importance and attention. Accentuated by the protracted length of criminal trials, plus the high cost of the housing and living facilities required by the jury, the trend of modern decisions seems to be constantly tapering off from the ancient idea that the confinement of the jury in a criminal case is a prerequisite to insure an uninfluenced verdict. The rigidity of the former procedure is no longer accepted by the courts as a whole. Judicial discretion and proper supervisory powers are meeting with constantly added

support, and the basis of determination seems to be whether or not the record indicates any actual or possible prejudice by reason of the departures indulged in. A full and interesting treatise on the subject, presenting all phases of the many conflicting decisions, is found in *State of Washington v. Amundsen*, 37 *Wash. 2d* 356, 223 *P. 2d* 1067, 21 *A. L. R. 2d* 1088.

The latitude allowed or the adherence to the rule varies according to the jurisdiction. A few states still maintain the dispersal of the jury is forbidden even where the defendant consents. In others, in increasing numbers, it is permitted in the discretion of the court but only where there is the consent of the defendant. In others, dispersal is permitted in the discretion of the court excepting where the defendant objects, while in still others dispersal is permitted in the discretion of the court even when the defendant objects. The states adopting the last rule are in predominance by a large majority.

The question appears to have been clarified and settled in the federal jurisdiction, where jury separation even in a capital case is discretionary with the trial judge. *Wheeler v. United States*, 82 *U. S. App. D. C.* 363, 165 *F. 2d* 225 (*Ct. App. D. C.* 1947), *cert.* denied, 333 *U. S.* 829, 68 *S. Ct.* 448, 92 *L. Ed.* 1115 (1948). The defendant was found guilty of murder and sentenced to death. His complaint, amongst other things, was that the jury was allowed to separate during the course of the trial. The court said (165 *F. 2d,* at *page* 229):

"Whether to keep the jury together in the trial of a capital case is discretionary in this jurisdiction. The court's action in that respect will not be reviewed unless it appears affirmatively that prejudice resulted to the defendant."

The inquiry here is whether or not the rule of sequestration, as existing in our jurisdiction, should be dogmatically followed where the prosecutor waived the death penalty and the defendant not only consented but importuned and proposed the suspension of the sequestration rule.

470

In *State v. Auld*, 2 *N. J.* 426 (1949), the trial judge, in response to a request by the jury and with the consent of the defendant's counsel but in the absence of the defendant himself, transmitted to the jury a paper on which he had written the possible verdicts it could return, and it was contended this was error. Justice Oliphant for our court determined there was no interference with the defendant's right to maintain his defense on the merits and no prejudicial error by reason of his absence, saying (at *p.* 431):

"Unfortunate, inexcusable and irregular incidents amounting to bad procedural practice occurred during the course of the trial of the case. Neither the Judge, the Prosecutor of the Pleas or counsel for the defendant should have allowed these situations to have arisen."

And again, noting particularly that no objection to the procedure was made by counsel nor was any request made that the defendant be present, the court said:

"The defendant has further failed to take into consideration *Rule* 1:2–19(*b*) which provides 'No judgment given upon any indictment shall be reversed  *  *  *. For [*sic*] any error except such as shall have prejudiced the defendant in maintaining his defense upon the merits.'

Conceding the procedure here to be irregular both as to the privy communication of the judge with the jury and the absence of the defendant at some stages of the trial, which we are compelled to do, the sole test is whether such irregularities prejudice the defendant in maintaining his defense on the merits."

In *State v. Roscus*, 16 *N. J.* 415 (1954), like the *Auld* case, *supra*, a trial resulting in the death penalty, error was claimed because of the interruption of sequestration of the jury. But the court found the defendant consented to what had occurred, and we unanimously held (at *page* 428):

"There was clearly no error, and, even if one had existed, the defendant waived it by failing to enter timely objection thereto."

The defendant here attempts to show prejudice by reason of an article appearing in a certain newspaper publication, but there is no proof that the jury was influenced or even read the article in question.

Our rules provide that no judgment shall be reversed for any error except such as shall have prejudiced the defendant in maintaining his defense on the merits. *R. R.* 1:5–1(*b*). The record in the instant case shows no such factual basis.

The defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial.

We have found no such adjudication on our books, nor are we prone to extend or enlarge the ruling in other factual situations to apply to the case *sub judice*.

In a murder case, where the death penalty is waived by the prosecution and the defendant asks for or consents to the dispersal of the jury, the defendant will not then be heard to claim error or prejudice after the verdict is rendered, unless he can prove he was prejudiced.

### The Limitation of the Cross-Examination of the Witness Doris Pontery

The defendant assigns error in the trial judge's limitation of the cross-examination of the State's witness, Doris Pontery. Doris was one of two eyewitnesses who testified for the State. Her testimony was pertinent and impressive, and the defendant had the right to seek to minimize its importance by attacking the witness' credibility. Her hostility toward her mother and any special interests she may have had in testifying against her were fair grounds of inquiry.

The defense endeavored to show that Doris was hostile toward her mother, and additionally, she had a special interest in testifying against her. To show her antagonism, defense counsel asked her whether she had not, shortly after her mother and father separated, gone to her mother's safety deposit box and withdrawn her mother's jewelry without her mother's permission. On objection, the trial court excluded this testimony.

During the discussion of the court's ruling in this respect, counsel announced he also intended to ask Doris whether she was, except for a legacy to William, her brother, the sole beneficiary under her father's will and whether she knew that if her mother was convicted, her mother would forfeit her interest in all real estate owned by her father.

The prosecution did not object to this line of cross-examination but the court refused, on its own volition, to allow any such questions to be asked. In the trial court's opinion, as expressed, it would do nothing but prejudice the jury. He said he did not feel it was proper "to permit this sort of examination of this particular witness on the theory that she is lying or in order to feather her own nest financially * * *."

On the following day, the court, discussing the ruling on the question, announced any such line of inquiry "might tend to degrade the witness" and refused to permit counsel to proceed along this line.

We think the court erred in this respect and that the ruling was prejudicial, requiring a reversal of the judgment rendered.

In our jurisdiction, no witness has the privilege against giving testimony simply because it might degrade him. In *In re Vince*, 2 *N. J.* 443, 454 (1949), we said: "* * * the answer appears to be clear that no such privilege exists."

Additionally, as a general rule, any fact which bears against the credibility of a witness is relevant to the issue being tried, and the party against whom the witness is called has a right to have that fact laid before the jury in order to aid them in determining what credit should be given to the person testifying. *State v. Black*, 97 *N. J. L.* 361 (*Sup. Ct.* 1922). And it is proper for either the defense or the prosecution to show the interest of a witness as bearing upon the witness' credibility. *State v. DiDolce*, 109 *N. J. L.* 233 (*E. & A.* 1932). Were it otherwise, the value of cross-examination in the search for truth which goes on in our courts every day would be severely curtailed and in some respects perhaps extinguished altogether.

This does not mean, however, that the cross-examiner has a license to roam at will under the guise of impeaching the witness. By the great weight of authority here, *e. g., Fielder v. Friedman,* 124 *N. J. L.* 514 (*E. & A.* 1940); *State v. Todaro,* 131 *N. J. L.* 59 (*Sup. Ct.* 1943); and elsewhere, *Kelly v. Meyer,* 156 *Kan.* 429, 134 *P. 2d* 658 (*Sup. Ct.* 1943); *Heathcock v. Wolfe,* 136 *S. W. 2d* 105 (*Mo. App.* 1940); *McCauley v. Pacific Atlantic S. S. Co.,* 167 *Ore.* 80, 115 *P. 2d* 307 (*Sup. Ct.* 1941); *Blue v. State,* 224 *Ind.* 394, 67 *N. E. 2d* 377, 380 (*Sup. Ct.* 1946); 3 *Wigmore, Evidence* (*3rd ed.* 1940), §§ 943 *et seq.,* the trial judge has broad discretion to determine the proper limits of cross-examination of a witness whose credibility is put in issue.

The fact that the daughter had gone to the mother's safety deposit box to remove her jewelry without the mother's permission and the mother's subsequent demand for its return was admissible as having some relevancy demonstrating the daughter's animosity to her mother.

In *Neiman v. Hurff,* 11 *N. J.* 55 (1952), we held that the mother would forfeit an estate by the entirety. Such being the law, Doris certainly stood to gain from her mother's conviction of the crime of murder and it was a proper field of inquiry on cross-examination to determine the daughter's knowledge of the financial benefit she might acquire if her mother were convicted of the crime for which she was being tried. Her knowledge and awareness of it would have a material bearing upon the witness' interest.

Although the court had no knowledge of it at the time of its ruling, the subsequent admission by the witness that she had committed perjury at the trial and her recantation of certain testimony which she had given indicates the cross-examination was being pursued in fertile fields and was directly related to the witness' possible motives for falsification.

## THE ADMISSION OF THE SHIRT WORN BY THE DECEASED

It is said the trial court erred in admitting into evidence Exhibit S–33, a blue shirt said to have been worn by the

deceased at the time he was shot. It is claimed there was no positive identification since the doctor who performed the autopsy and in whose presence the shirt was removed from the body of the deceased could not specifically identify it but said: "It resembled this shirt very much but I could not say this was the shirt."

He also testified that he gave all of the deceased's possessions, including the clothing which had been removed from Dr. Pontery, to Martin, a detective in the New Jersey State Police Department, in a pasteboard carton. Martin testified he received the clothes from Dr. Costello, amongst which were an undershirt and an outershirt. He identified an outershirt shown to him by the prosecutor as the one which he received from Dr. Costello and which he turned over to Detective Lea. This shirt was marked S–33 for identification. Lea testified he gave the shirt to Mr. Duffy, a chemist employed by the New Jersey State Police, who examined the shirt and returned it to Lea. The shirt was subsequently marked Exhibit S–33 in evidence in the trial.

Condit, an attendant at the Dover Morgue where Dr. Pontery's body was taken, testified he assisted Dr. Costello in performing an autopsy on August 7 and removed the clothes from the body. The clothes were placed in a box by him and Dr. Costello. He testified that only one corpse was undressed at the morgue on that day.

Doris Pontery in her testimony described the shirt her father was wearing on August 7 and the shirt she described was identical to Exhibit S–33.

The evidence seems to indicate positive identification of S–33 and there was ample evidence in reference to it to justify its admission in evidence.

## The Admission of Conversations with the Police Officers by Monseigneur Monteleone

It will be recalled the Monseigneur did not testify in person at the trial but his deposition, taken some time before, was offered in evidence. His testimony supported the de-

fendant's version in almost all respects. On rebuttal, the prosecution called several police officers to testify as to their conversations with the Monseigneur following the shooting, in which the Monseigneur had apparently made statements contradictory to those which he gave in his deposition. The defendant urges, these statements not having been given in the presence of the accused, were hearsay and were not admissible as part of the *res gestae*.

There is little merit in the defendant's view. Irrespective of the *res gestae* rule, the statements were offered by the prosecution and were admissible as prior inconsistent statements of the witness, a proper foundation having been laid therefor on cross-examination, *e. g., Chiesa v. Public Service Co-ordinated Trans.*, 128 *N. J. L.* 69 (*E. & A.* 1942).

## THE COURT'S REFUSAL TO CHARGE THAT THE DEFENDANT HAD A RIGHT TO DEFEND HERSELF WITHOUT RETREATING

The defendant contends the trial court erred in charging the jury as follows:

"A person upon whom an assault is made so violent in its character as to endanger his life or threaten him with serious bodily injury is not justified or excusable in standing his ground and killing his assailant if he can avoid the impending danger by retreating."

Since Mrs. Pontery was in her own home, the defendant urges she was under no obligation to "retreat to the wall" before acting in her own defense.

This, of course, is the traditional common-law doctrine. The problem here, however, is different as the home in which the shooting occurred was owned jointly by the decedent and the defendant and under our law, while the doctor was alive, he had an equal right to be there. Under these circumstances, the common-law rule was not applicable and the court committed no error in its charge as to the doctrine of retreat. *State v. Grierson*, 96 *N. H.* 36, 69 *A. 2d* 851, 854 (*Sup. Ct.* 1949); *Commonwealth v. Johnson*, 213 *Pa.* 432, 62 *A.* 1064 (*Sup. Ct.* 1906).

## THE TRIAL COURT'S CHARGE AS TO THE DEFENDANT'S USE OF NARCOTICS AND INTOXICANTS

During the selection of the jury the prosecutor asked the prospective jurors whether they believed a person would be justified in committing a crime while under the influence of drugs or alcohol. No testimony, however, was offered at the trial with respect to the defendant's use of either drugs or intoxicants, but the court nevertheless, in charging the jury, referred to them, saying it did not remember any testimony about them but if there was any, it would be for the jury to determine whether the testimony had a real bearing on the facts in the case being submitted.

The defendant urges this was error inasmuch as the jury might have inferred from the court's remarks that there was in fact testimony as to the defendant's use of drugs and alcohol.

It would have been better judicial procedure had the court instructed the jury not to consider the prosecutor's initial remarks about drugs and alcohol as there was no testimony offered in reference thereto, but we do not think the court's remarks were prejudicial to a degree requiring a reversal.

## THE COURT'S DEFINITION OF MURDER, MANSLAUGHTER AND MISADVENTURE

As to these various alleged errors in the court's charge, we deem them lacking sufficient merit requiring specific disposition. Suffice it to say that not only does the record show no objection taken as required by our rules, but it reveals expressions of trial counsel approving what was charged. Additionally, in most instances what was said followed substantially language already approved by our court of last resort in other similar cases.

## THE TRIAL COURT'S INTERFERENCE WITH THE PREROGATIVE OF THE JURY

The case was submitted to the jury shortly after two o'clock in the afternoon. At 8:45 P. M. the jury returned for further

instructions. It retired again at 8:50. A few minutes after midnight the court returned the jury to the trial room and asked if there was a reasonable chance that they might arrive at a verdict. The foreman replied, "I think so," and the jury retired for further deliberation.

At 12:57 A. M. the court had the jury brought in again and inquired whether they could arrive at a verdict with further deliberation. The foreman announced: "I am sorry, we can't, sir * * * We can't reach a decision." The court then asked the foreman to tell him in numbers only how the jury was divided. The foreman replied the jury was divided eleven to one, whereupon the court said: "Eleven to one. I want you to go back and deliberate further in connection with this matter." The jury returned at 1:22 A. M. and announced its verdict of guilty of manslaughter.

No exception to the court's utterance or direction was taken, but her new counsel insists the court's conduct was tantamount to an attempt to coerce and improperly persuade the jury by invading its independence by improper judicial effort.

It was well within the discretion of the trial court to return the jury for further deliberation despite the fact that they had announced their inability to arrive at a verdict. And in determining whether to so exercise his discretion, the trial judge could properly inquire as to whether or not the jury entertained a predominant view without disclosing what it was. However, to ask the explicit numerical standing of the jury, as was done here, is not to be encouraged as sound judicial procedure.

This form of specific inquiry easily lends itself to suggested or apparent compulsion and should be avoided, especially where, as here, the trial judge returned the jury for further deliberation after having ascertained that they were divided eleven to one. Under the circumstances present, the absence of any cautionary instructions was closely akin to unlawful compulsion as set forth in *In re Stern,* 11 *N. J.* 584 (1953).

However, we are confident that the same difficulty will not occur again, and in view of the disposition already made, it

is unnecessary for us to make any definitive ruling on this assignment of error.

## The Refusal to Grant a New Trial

The circumstances of Doris' confession of perjury after the trial was concluded and when sentence was about to be pronounced have already been recounted. The defense urges her new testimony constituted newly discovered evidence and was sufficient to warrant a new trial.

The court did not feel this evidence was "newly discovered" within the meaning of *R. R.* 3:7–11. The trial court was also of the opinion that the testimony would not change the result were a new trial to be granted.

There is at least a possibility that Doris' credibility as a witness might be impaired to some degree by virtue of her recantation. Then, too, the credibility of her brother's testimony might also be reflected upon in view of the fact that her present version, instead of supporting his testimony, would in some respects be in conflict with it.

These two witnesses played an important part in the State's presentation, but we deem it unnecessary to discuss the ruling *in extenso* in view of our conclusion already reached that a new trial is required.

For the same reason we find it unnecessary to rule upon other errors assigned.

The judgment below is reversed and the cause remanded for a trial *de novo*.

Heher, J. (concurring in reversal). At common law, the jurors in criminal cases were not permitted to separate, even with the consent of the accused; and in this country the dispersal of the jury in the exercise of judicial discretion came by statute, limited in most of our state jurisdictions to noncapital cases. 53 *Am. Jur.* 629 *et seq.*; 34 *A. L. R.* 1128, 1132, 1140, 1146; 79 *A. L. R.* 826; 21 *A. L. R. 2d* 1100, 1105, 1107, 1109. The rule against separation is intended to secure an impartial and unbiased verdict by a

jury immune to extraneous and prejudicial influences. And, because of the gravity of the issue, seclusion of the jury has been deemed of the very substance of a fair trial in capital cases.

In *Peiffer v. Commonwealth*, 15 *Pa.* 468 (*Sup. Ct.* 1850), Gibson, C. J. said:

> "Even the forms and usages of the law conduce to justice; but the common law, which forbids the separation of a jury in a capital case before they have been discharged of the prisoner, touches not matter of form, but matter of substance. It is not too much to say that if it were abolished, few influential culprits would be convicted, and that few friendless ones, pursued by powerful prosecutors, would escape conviction. Jurors are as open to prejudice from persuasion as other men, and neither convenience nor economy ought to be consulted, in order to guard them against it. Let them have every comfort compatible with their duties; but let them not be exposed to the converse of those who might pervert their judgment."

In the words of Beasley, C. J., the sequestering of the jury in all capital cases was a basic requirement of ancient English law—"an institute of law which is wholly beyond the control of the court, and which belongs to the citizen as of right"; "a requisition of absolute law" which "is not, in any measure, a matter resting in the discretion of the court." *State v. Cucuel*, 31 *N. J. L.* 249 (*Sup. Ct.* 1865). The Chief Justice continued:

> "No one acquainted with the subject will deny that this practice prevailed for many successive ages, and so far as is known to me, it has never been departed from by any English judicature. In this state, almost from the epoch of its settlement by our ancestors to the present moment, as we are informed by history, both printed and oral, the same formula has been observed. From these admitted incidents then, it would seem to be incontestably plain, that the formula itself is invested with every possible claim, to be considered a part of that legal system which this court is bound to sustain and administer. It is not a matter of unsubstantial form, but one of the means provided by the law, to reach the result of a verdict founded exclusively on the evidence delivered in open court in the presence of the parties. It is, therefore, as much a right of the defendant as is any other act which the law requires, by immemorial usage, to be performed at the trial. It is altogether impossible to admit the right of the court, at its pleasure, to waive the per-

formance of this act. If the seclusion of the jury can be dispensed with before the charge of the court, why not dispense with it after such charge? And if the power to alter in one respect the admitted mode of ancient procedure is conceded to the court, what power to alter the forms of the trial can be denied? * * * It appears to be altogether illogical, admitting the great antiquity of the form of the separation of the jury from the mass of the community in capital cases, to maintain the right of the court to abolish such form, without at the same time admitting the right of the court to retain or set aside, at will, all the other essential circumstances which go to make up the proceedings of a trial at law. But it is enough for us to know that this court has heretofore laid claim to no such power; that it has ever conformed its practice, with implicit obedience, to the ancient usages, leaving to the legislative department of the government the task to modify the law, so as to place it in harmony with the ever shifting conditions of human life."

In 1932, the old Court of Errors and Appeals unanimously reaffirmed the principle of jury seclusion as protective alike of society and the accused. *State v. O'Leary,* 110 *N. J. L.* 36 (*E. & A.* 1933).

This ancient usage of the common law continues in force until modified by constitutional authority. 1947 *State Constitution, Art.* XI, *sec.* 1, *par.* 3; 1844 *Constitution, Art.* X, *par.* 1. The sequestering of juries in capital cases is a peremptory rule of substantive law to serve the common right and individual justice.

It was the judge who broached the subject of separation, not counsel for the accused. Immediately after being sworn, the jury were escorted from the courtroom for a "short recess," and the judge thereupon inquired of the prosecutor as to whether it was his "intention to ask for the death penalty," stating that the inquiry was put "with the thought of possibly not sequestering the jury" and "both the prosecutor and the defense attorney ought to make statements as to their feelings about the sequestering of the jury." The prosecutor replied that the State would ask for a verdict of murder in the first degree, but would not "demand" the death penalty. The judge said that, there being no demand for the death penalty, "it seems to me that it would not be necessary to sequester the jury," but he "would like to hear

from the defense attorney first on that question." Counsel responded that "if the State does not seek the death penalty," he could "see no reason why the jury should be sequestered." The prosecutor thought otherwise; "the jury should be sequestered" he suggested; and the judge said: "All right. That will be the situation at your request. I certainly would not grant it otherwise." The judge had the notion that the question was one of discretion, but he would not direct the seclusion of the jury if either side thought otherwise. Counsel for the accused then indicated, as I read the record, that if it were a question of discretion, the accused would be satisfied either way. But the judge reiterated that in view of the prosecutor's attitude, the jury should be sequestered. At the close of the testimony on the following day, after a conference with counsel out of the presence of the jury, not incorporated in the appendix, the judge informed the jury that since the State "was not asking" for the death penalty, a "capital offense" was not involved, and so there was no need for the seclusion of the jury; that counsel for the accused and the prosecutor had "both indicated" they would have "no objection" if the judge permitted the separation of the jury, and such would be the order.

Counsel for the accused should not have been subjected to this solicitation of consent, for such it was, even in the absence of the jury. What assurance could there be that the jury would not learn of counsel's refusal of consent to their separation, a fear that would deter insistence upon the right.

Apropos of this, Chief Justice Gibson said in the cited case of *Peiffer v. Commonwealth*:

"A juror is charged with a prisoner as soon as he has looked upon him and taken the oath; for he cannot be withdrawn. The trial has commenced, and the prisoner stands before him as one of his judges. In this case the jury were allowed to separate after they were empannelled and sworn. True, that took place with the prisoner's consent; but there is right reason and sound sense in Chief Justice Abbott's remark, in *Rex v. Wolfe* (1 *Chitty's Rep.* 401), that he ought not to be asked to consent. Who dare

482

refuse to consent, when the accommodation of those in whose hands are the issues of his life or death, are involved in the question? He would have to calculate the chances of irritation from being annoyed on the one hand, or of tempering on the other. The law is undoubtedly settled by precedent, that a prisoner's consent to the discharge of a previous jury is an answer to a plea of former acquittal; but the instant a jury is discharged, the prisoner's life is no longer in their power; or if he should be the cause of their being sent· back to protracted confinement, the value of a single chance in his wretched condition would disarm their resentment. Still, I think no consent of a prisoner, in the extremity of his need, ought to bind him."

And in *Hopt v. Utah*, 110 *U. S.* 574, 4 *S. Ct.* 202, 28 *L. Ed.* 262 (1884), Justice Harlan declared:

"The public has an interest in his [the accused's] life and liberty. Neither can be lawfully taken except in the mode prescribed by law. That which the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with or affected by the consent of the accused, much less by his mere failure, when on trial and in custody, to object to unauthorized methods."

I join in the conclusion of error in the instruction given that in the event of a conviction of murder in the first degree, "it must be with the recommendation of life imprisonment." It is the exclusive province of the jury to fix the punishment. This, in virtue of *N. J. S.* 2*A*:113–4. Neither the judge nor the prosecutor may determine this question. The statute provides, in imperative terms, that every person convicted of murder in the first degree "shall suffer death unless the jury shall by its verdict, and as a part thereof, upon and after the consideration of all the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed." And so, I cannot subscribe to the holding of the majority that the court "could properly have charged the jury that under these present circumstances it would assume, as did the prosecutor, that the death penalty would not be returned as it was not asked for," an undue qualification, it would seem, of the concluding clause that "the jury could not be stripped of its right to do so given by the Legislature."

Otherwise, I concur in the disposition of the assignments of error.

Mr. Justice OLIPHANT concurs in this opinion.

HEHER, OLIPHANT and BURLING, JJ., concurring in result.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For affirmance*—None.